In The



Court of Appeals



Ninth District of Texas at Beaumont



____________________



NO. 09-01-355 CR


____________________



BENNETT MICHELLE KING, Appellant



V.



THE STATE OF TEXAS, Appellee






On Appeal from the 252nd District Court


Jefferson County, Texas


Trial Cause No. 82265






O P I N I O N


 A jury convicted Bennett Michelle King of felony theft. The trial court sentenced
King to ten years' confinement in the Texas Department of Criminal Justice, Institutional
Division, suspended the imposition of sentence, placed King under community supervision
for a term of six years, and assessed a fine of $3,000. King was ordered to pay the fine,
court costs, and various fees. Regarding restitution, the order provides "$150,000.00 To
Be Determined in Arbitration." 

 King's first point of error contends the evidence is legally insufficient to support his
conviction. In reviewing the legal sufficiency of the evidence, we determine whether, after
viewing the evidence in the light most favorable to the prosecution, any rational trier of
fact could have found the essential elements of the offense beyond a reasonable doubt. See
Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); Lacour
v. State, 8 S.W.3d 670, 671 (Tex. Crim. App. 2000).

 King was indicted for felony theft "by acquiring and exercising control over
corporeal personal property, namely: forty-five (45) tow dollies, owned by JESSE
COPELAND, . . . with the intent to deprive the Complainant of the said property, and
without the effective consent of the Complainant." The jury was instructed as follows:

 You are instructed that to constitute theft in this case, it is necessary
that the State establish by the evidence beyond a reasonable doubt that the
defendant acquired the property in question, that at the time of the
acquisition the defendant acquired it by means of deception, as that term has
been defined herein, with the intent at the time of acquisition to deprive the
owner of such property, and the offense of theft is complete when such
property is acquired by the defendant, provided the intent to deprive the
owner thereof existed at the very time the property was so acquired by the
defendant, and that this is the case notwithstanding that the possession of the
property acquired, if it was so acquired, may have been acquired by the
defendant by permission of the person from whom it was acquired. 


The charge defined deception as:


 Deception means creating or confirming by words or conduct a false
impression of law or fact that is likely to affect the judgment of another in
the transaction, and that the actor does not believe to be true, or 

 Promising performance that is likely to affect the judgment of another
in the transaction and that the actor does not intend to perform or knows will
not be performed, except that failure to perform the promise in issue without
other evidence of intent or knowledge is not sufficient proof that the actor
did not intend to perform or knew the promise would not be performed. 


See Tex. Pen. Code Ann. § 31.01(1)(A), (E) (Vernon Supp. 2002).


 Because King was charged with theft by deception, the State was required to prove
that at the time the tow dollies were taken, King did not intend to pay for them. The facts
of this case are such that we find it necessary to detail King's relationship with Copeland
in its entirety. Thus we present as complete a portrayal of events as the evidence adduced
permits.

THE BUSINESS ARRANGEMENT


 Jesse Copeland is CEO of Perkins Trailer Company. His partners are his brother-in-law, Charles Perkins, and Gary Warren. Warren acquired an interest in Perkins Trailer
in 1998. Prior to the fall of 1997, Perkins Trailer had only built six or seven tow dollies
and was not "in the business." In 1997, Perkins Trailer did not have nationwide
distribution capability and the sales force consisted of Copeland and Charles Perkins. 
Sales were mostly done by phone and Perkins Trailer had four trucks out on a regular basis
delivering trailers. 

 King testified that in November of 1997 he had his own business, Tow Right
Distributing. King bought tow dollies from Tow Right Manufacturing and sold them. 
King met Copeland after selling some dollies to Gary Warren. At the time, King had
approximately 270 customers across the United States. The dollies King sold came from
different manufacturers and with each manufacturer, except Master Tow, King testified
he had the same agreement: he bought the dollies on credit and received the title. 

 Warren introduced Copeland to Ben King with a proposition that it would be
profitable for Perkins Trailer to start manufacturing tow dollies. According to Bruce
Deason, the plant manager for the tow dolly division, it was King's idea for Perkins
Trailer to go into the tow dolly business. Copeland acknowledged that prior to the
agreement with King, Perkins Trailer did not have a facility to manufacture tow dollies.
Copeland testified it was part of the agreement that King would provide the "know-how"
to manufacture tow dollies. King provided the specifications/diagrams of the plans to build
tow dollies, located all the suppliers and worked out agreements with them, found the
manufacturing equipment and arranged delivery, brought Dewey Rathburn in to set up the
equipment and assembly lines, explained to Deason how to set up the assembly lines, and
got the assembly lines into operation. 

 According to King, the arrangement was that Perkins Trailer would manufacture
the dollies and King would buy and sell them. King would set up his dealers and sales. 
King testified that Copeland did not want to know any of his dealers or anything about his
business, he just wanted King to buy all the dollies they built. Perkins Trailer was
supposed to be in production by January 15, 1998, but it was not. 

 King testified he spent about a month finding suppliers for the component parts and
getting blueprints and plans. During that time, he was borrowing money against his line
of credit from Perkins Trailer. He bought six or eight utility trailers from Perkins Trailer
and put them on his line of credit. From January to the middle of April 1998, King was
working on a full-time basis to get Perkins Trailer into production. King received no
compensation for that work. According to Copeland, King did not contribute any of his
own money to the tow dolly division and was never a partner or co-owner. However,
King testified that Copeland added half the transportation costs he incurred in picking up
component parts for the plant to King's debt. 

 The name of the tow dolly line was Load Star. Both Copeland and Deason testified
that the name Load Star was a concerted effort between King, Copeland, and Deason.
Admitted into evidence as Defense Exhibit 13 is a business card King said he got from a
dealer in North Carolina in 1997. That company was selling a brand of trailers under the
name "Load Star." According to King, the dealer gave him permission to use the name
and King told Perkins Trailer he was calling his tow dolly operation "Load Star." Deason
was unaware there was already a dolly company out there by that name. According to
Copeland, "[t]he main issue" in the civil lawsuit he filed was to prevent King and the other
defendants from using the name "Load Star" and purporting they represented Perkins
Trailer Company when visiting dealers. 

 Copeland testified there were no written agreements or contracts between him and
King, only a photograph providing King was sales manager. The photograph, State's
Exhibit 11, was taken in April of 1998 at King's request when the first load of tow dollies
rolled out. Copeland testified it is his writing below the photograph that reads, "Ben King
will handle all tow dollie [sic] sales. Confirmed with a handshake and verbal
commitment." Copeland and Charles Perkins both signed it. 

 According to King, Copeland kept promising they would go to his lawyer and have
a contract drawn up. The day the first load of dollies went out, King asked Copeland if
they were going to the lawyer to have the contract done, and Copeland said there was not
time and that it would be done when King got back. King explained to Copeland about
problems with other manufacturers and refused to leave without some kind of contract so
the picture was taken. Copeland said that was the contract until King got back, but no
other contract was ever prepared. 

 Perkins Trailer issued manufacturer's certificates of origin for its tow dollies. 
Copeland testified the certificates were completed by Perkins Trailer except for the
owner's name and given to the drivers. King testified when he bought the dollies, he
received the manufacturer's certificates of origin and he believed he owned the tow dollies
when they left Perkins Trailer. However, both Copeland and Deason said King was given
the tow dollies on consignment. Copeland and Deason both denied the dollies were sold
to King on credit. Copeland testified that King told him he had bad credit. According to
Copeland, knowing King had bad credit and "couldn't even maybe get a loan for a truck
on his own," he would not "have loaned or sold these tow dollies to [King] on credit." 

 King was Sales Manager for the tow dolly operation; he coordinated all the sales
and deliveries. King delivered tow dollies himself and was allowed a staff to help sell and
deliver. Copeland testified that King brought on Dewey Rathburn, Patrick Varner, Rodney
Varner, Jason Summerall, and Roy King, his father, for that purpose. King came in and
picked up a load of tow dollies, went out and sold them, and was to bring the money back,
along with any unsold dollies. King was responsible to Perkins Trailer for the wholesale
value of the dolly and made his money by selling the dollies above wholesale. 

 When King or another driver left with a load, Deason prepared an invoice showing
who was leaving with the dollies, the number of dollies, the date, and the dollar value. 
At the bottom, Deason had King or the driver sign his name. State's Exhibit 9 is the
invoice for one of the loads King was charged with stealing; it was taken on September 25,
1999. Next to "Customer's P.O. No." is written "Ben King." At the bottom in the space
denoted "Received By" is Ben King's signature. State's Exhibit 10 is the invoice for the
other load King was accused of stealing; Jason Summerall left with that load on October
8, 1999. At the top of the invoice "Ben King" is written next to "Sold To" and at the
bottom, next to "Delivered By," is Jason Summerall's signature. Deason testified the
invoices he wrote on were not specially designed for that purpose but were just an invoice
they had in the company. He put who was responsible for the load on one of the lines at
the top without picking any specific line. 

 The invoices reflect King bought the owner's manuals, tires and wheels, and straps
for the dollies that went to the dealers. King paid $.50 for each manual, $38.50 per tire
and wheel, and $15.50 for a set of straps. In addition, King provided the warranty. Jason
Summerall testified King stood good on the warranty work and had him pick up the dollies
and bring them in. It was Jason's understanding that King had to pay for an extra dolly
in order to warranty it and it was King who took the loss, not Perkins Trailer. King
testified he provided a lifetime warranty on the dollies and that "a bunch of times" he had
to send a new dolly for "defective dollies." There was no "warranty" between King and
Copeland. 

 Deason testified that King had the right to take every tow dolly Perkins Trailer
produced and sell it. Copeland testified King worked for himself, not Perkins Trailers,
and was not subject to Copeland's control. However, Copeland felt he had the right to tell
King what to do because he (Copeland) owned the product King was selling. When King
left with dollies, Copeland did not always know where they were going because King
sometimes sold them after he left; it was up to King. Copeland had no control to whom
King sold and only "had a good idea" who the buyers were, but did not consider them
King's buyers because "I extended enough money that the buyers was [sic] a clientele for
Perkins Trailer Company." 

 King testified that his drivers were under instructions not to discuss with the people
at Perkins Trailer who his dealers were or the names of the buyers at the dealerships. 
King said he was trying to protect the names and locations of those dealers to prevent
Perkins Trailer from going behind his back and selling directly to the dealers, thereby
taking his profit. Jason Summerall testified that King did not want him discussing King's
business with Perkins Trailer. It was Jason's testimony they were not trying to hide
anything but King did not want Perkins Trailer to know who and where his dealers were
in order to keep them as his customers. 

 According to King, the customers usually wrote checks payable to him, sometimes
the checks were payable to Perkins Trailer, and some customers paid in cash. When King
came in to pick up another load, he decided how much to pay Perkins Trailer and how
much would be in checks, cash or credit. Jason Summerall testified that most payments
were made by check and not many dealers paid in cash. If Jason went straight back to
Perkins Trailer, he gave Deason the money and checks per King's instructions. King
testified that when a driver returned with cash and checks, Deason would call him and
King would decide how much of it to apply to his account. If there was not enough money
"to zero that trip," it would be charged over to King's account. King testified that no one
ever criticized his decisions. On occasion, King was given cash advances for expense
money. Copeland testified that typically the checks were made payable to Perkins Trailer
but when King or another driver needed expense money they would be authorized to have
the check made payable to them. 

 Copeland testified that from the time they started doing business King came up short
on loads, not every time but quite often. Deason did not know how many times King came
in short but it was "many times." Perkins Trailer just applied King's shortages to his debt. 
Nevertheless, Deason denied King had an account. King gave different reasons for being
short, such as the cost of being out on the road and setting up new dealers. Copeland
acknowledged it cost money to do that job. King indicated that if Copeland kept supplying
him with dollies, he would make up the prior debt and, at the time, Copeland believed he
would. Copeland felt like King would come up with enough money to pay it all off
because he was a good salesperson. At trial, Copeland testified he now thought the whole
thing was a conspiracy King planned "with all these other guys" at the inception of the tow
dolly business. 


THE TRUCKS


 Perkins Trailer provided King with a truck and trailer to deliver tow dollies. In
November 1997 a contract was executed for a red truck. The truck was purchased in
Copeland's name, but King would make the payments and once paid for, it would belong
to King. King was responsible for any repairs, insurance, license plates, etc. According
to the lease agreement, King had exclusive right to possession of the truck. Copeland
testified he had to make several payments. Copeland did not know who made the last
payment or when King last made a payment. Copeland reported the truck stolen and at
first said he considered the truck stolen because King did not bring it back. Copeland
claimed he had a right to the truck when King failed to return, although he acknowledged
that was not in the contract. However, Copeland then testified he reported the truck stolen
because it was the only way he could see to recover his other property, namely the money
for the tow dollies and his trailer. When Copeland reported the truck stolen, he did not
inform law enforcement about the agreement. Copeland did not know whether King was
behind in payments so when he made the report he did not know whether King had the
right to possession. King testified that he was current on the note at the time. The red
truck was taken back by Copeland but the records do not reflect King was given any credit
on his "debt" for either the down payment or any payments made.

 In the summer of 1998, Copeland signed for another truck, a green one, under the
same arrangement as before. King testified he paid $2,500 down on that truck to Charles
Perkins. King testified he was current on the note when the truck was picked up. 

 In 1999 a black truck was purchased. Copeland claimed he bought it as his personal
vehicle but then let Jason Summerall drive it for King. According to Copeland, he was
not selling the black truck to King and it was not bought under an agreement; he just let
Jason use it. Copeland initially testified that the only agreement was for King to make the
payments. Copeland testified King did not make the down payment on the black truck. 
But Defense Exhibit 2 reflects the down payment was added to King's debt. Copeland
testified the down payment was not a loan. Copeland then recalled that when Jason took
the truck it was King's intent to cover the down payment Copeland had made. King
testified he bought the black truck from Copeland in March 1999. King made some
payments but was inconsistent. Copeland and King never discussed what would happen
if King paid off the truck. The black truck was taken back by Copeland, but again the
records do not reflect King was given any credit for any payments made. Defense Exhibit
2 does show that in April 1999 King was credited $527.57 of the $3,500 he was charged
for the truck down payment. King testified he was current on the note when the truck was
taken. 


THE SEPTEMBER 25
TH AND OCTOBER 8TH LOADS


 State's Exhibits 9 and 10 are two invoices prepared by Bruce Deason. Exhibit 9
shows Ben King, as the customer, in receipt of 24 tow dollies, 2 tires and wheels, 4 sets
of straps, 12 owners' manuals, and a cash advance, for a grand total of $11,889. King left
with his load on September 25, 1999. 

 Exhibit 10 reflects a cash advance was given, and 21 tow dollies, 3 tow dollies 14",
2 tires and wheels, 4 sets of straps, and 24 owners' manuals were "Sold to Ben King," for
a grand total of $11,555. Exhibit 10 provides delivery is via Jason Summerall. Summerall
left with his load on October 8, 1999. 

 King testified he picked up the load September 25th to go sell it. He could not say
where it all went but said he did not sell it until sometime in November. According to
King, he went to his house to take a few days off after being out of town for six to eight
weeks in New Mexico. King said during that time he was discussing selling his business
to Copeland. 

 Jason testified that King told him to deliver his load to T&B in South Carolina. On
the way, the "check engine" light in the truck came on. Jason dropped his trailer off with
the full load of dollies at T&B and the next day the truck was taken to the Dodge
dealership where it stayed for the next three weeks. During that time, Jason went to T&B
and checked on the trailer, and found about half the tow dollies were gone. After Jason's
truck got out of the shop, King told him to take the remaining tow dollies to Ohio and
Virginia with Patrick Varner. At that time, Jason knew Varner was in trouble for stealing
tow dollies. King had said to have one check made payable to him and the other made
payable to Perkins Trailer. The dealer in Virginia made the check payable to King but the
dealer in Ohio paid in cash. Jason returned to Greenville and gave King the cash and
check. 

 King testified that Jason made a drop of around eight to ten dollies before getting
home to South Carolina. Both Copeland and Deason testified that King was responsible
for Jason's load because Jason was actually employed by King and under his direct
supervision. According to Copeland, King never denied having possession of the two
loads. At trial, King did not deny being responsible for Jason's load. 

 Although Copeland testified that after September 25, 1999, he did not see King
again until the day of trial, he did talk to King on several occasions. According to
Copeland, King said he had not returned because he was "short" and was selling someone
else's tow dollies to make up the difference. Copeland told King he must return with
either the dollies or the money and threatened to file criminal charges. 

 Deason testified he started to wonder when King did not return because he usually
returned within a few weeks to settle up and pick up another load. After King left with
those loads, Deason stayed in daily contact with King. Deason talked to King about why
neither he nor Jason had returned and King told him a truck was broken down. King
testified they called Perkins Trailer for a credit card number to pay for the truck repairs
because when Jason picked up the load on October 8th he had left King's money with
Deason. 

 King testified that during September and October 1999, Buddy (Dewey Rathburn's
replacement) had delivered six loads for him. King called Deason and told him to either
pay off the load he had or the load Jason had with the money from those deliveries. 
Deason told King he could not do that because he already put the money somewhere else.
According to King, it was over $10,000. King said that is when he decided to quit buying
from Perkins Trailer. King did not know where the money went, only that Copeland told
him it was taken off his debt. King told Copeland he wanted to use the money to pay for
one of the outstanding loads and Copeland said he had already taken if off the debt. King
asked for a copy of where it was taken off and they "got in a big fuss over the phone." 
At that time, King did not know what his balance was but he thought it was around
$35,000 because the last statement Copeland had given him was for around $36,000 and
he had since paid $1,000. King told Copeland that he would not do any more business
with him until Copeland showed him where the money went. Copeland said he would get
Deason to fax King something but King never received anything. 

 King left South Carolina and headed back to Texas to straighten things out. He sold
the remaining tow dollies on the way. King never reached Texas because when he spoke
with Copeland over the phone from Shreveport, Louisiana, Copeland threatened to have
him killed if King came down there. King said he told Copeland he just wanted his
money. King went back to South Carolina and a few days later Copeland called and told
King "that we was [sic] going to get this thing worked out. I was selling tow dollies, and
they was delivering."

 Copeland and Deason went to South Carolina to retrieve the trucks and trailers used
in delivering the two loads taken by King and Jason. Deason testified he learned from
Copeland where the truck and trailers were and that Copeland had heard it from someone
else. There, Copeland attended a meeting at T&B Manufacturing. King testified he was
part owner of T&B Metals, along with Terry McCleese, Bill Spivey, and Ernie Howard. 
King owned twenty-five percent of the business. He testified he got involved with T&B
when he "was going to go to work and sell [his] sales to Perkins." King said he would not
be in competition with himself, he was not involved in any sales for T&B and did not
participate in the operation of the business. King's twenty-five percent was in exchange
for showing Terry and Bill Spivey how to build the tow dollies. This occurred before the
falling out with Copeland. 

 Copeland testified Bruce Deason, Jason Summerall, Patrick Varner, Dewey
Rathburn, and another tow dolly manufacturer were present at the meeting. Jason testified
the meeting also included Deason, Gary Warren, Dewey Rathburn's son, daughter-in-law
and grandchildren, Terry McCleese, Rodney McCleese, Bill Spivey, Dr. Howard, Jason's
mother, Kent Keenan and Trey Keenan. King was not present. Copeland said the purpose
of the meeting was for him to gather his equipment and to see if anyone would help him
"stop" King. 

 Copeland testified that after the meeting, King called and demanded he quit
manufacturing tow dollies. Deason testified he also talked to King, who said they needed
to stop manufacturing tow dollies. When asked if he knew why King would say that,
Deason stated, "By the agreement that he said he had made with the owners of Perkins
Trailer Company, that he had the control of the sales of the tow dollies." Deason stated
he did not remember if he talked to King about the last two loads at that time. However,
on re-direct examination, Deason testified that King said he would not pay for those last
two loads unless they stopped manufacturing tow dollies. 

 Deason's testimony regarding the last time he talked to King was inconsistent. 
Deason first testified that his last conversation with King was when he was in South
Carolina in November 1999. Subsequently, he testified his last communication with King
was around the first of December 1999. When asked if he knew why King quit, Deason
said, "No," but then testified King did not quit, he just never returned. 

 After the meeting, Jason returned to Jefferson County with Copeland and Deason.
The trucks and trailers came back with them. Jason explained to Deason what happened
with those loads. Jason also met with Steve Thrower, an investigator with the district
attorney's office. Jason began working for Perkins Trailer delivering tow dollies. Jason
testified Deason was selling dollies over the phone to dealers around the country that King
had developed, but King was cut out of the deals. King did not receive any credit for the
sales Deason made to King's customers during that time. Of the tow dollies sold like that,
Jason said he probably delivered close to a thousand himself. The value to King would
have been approximately $150,000. 

 Jason heard conversations between King and Copeland about King selling the sales
and going to work for Jesse Copeland. Copeland wanted everyone that came to Texas with
King fired except Jason. Copeland wanted Jason to work for Perkins Trailer and King to
sell dollies out of his office for a salary of $2,000 a week. King said they were going to
buy his sales division for $250,000. Jason did not hear Copeland say there was going to
be such an agreement, but that is what King thought would happen. 

 Deason did not know Copeland was negotiating with King to buy him out. Deason
had heard from King around July of 1999 that King was selling out the sales division and
going to work for Perkins Trailer. King told Deason in November 1999 that he was going
to come in and sell from the office and would be paid a weekly salary of $4,000. Deason
never talked to Copeland about it. Deason did not know if that was why King quit buying
trailers from Perkins Trailer. 

 After Copeland filed the sworn complaint against King, he continued to do business
with him. Deason testified that King continued to sell trailers for Perkins Trailer by phone
to reduce his debt and that every penny King made after October 8, 1999, went to clear
up his debt. King testified that after he went back to South Carolina, Copeland called and
told him they had a bunch of tow dollies in the yard and could not sell them. Copeland
promised King that if he kept making tow dollies and selling them to King's dealers,
anything over $485 would go to pay off King's debt and eventually King would draw a
paycheck. King sold about 287 dollies for Copeland, representing about $28,000 worth
of profit. King sold trailers over the phone for two months without receiving any
compensation. This occurred in the time period between October 8 and December 19,
when King was indicted. After King was indicted, a certified letter was sent demanding
the money. It was sent back and Copeland did not think King received it. The letter
demanded only $11,889. 

 During that time, King learned Perkins Trailer was calling his dealers to try to sell
directly to them. King found out Perkins Trailer had cloned his beeper number. King
made a trip to Beaumont to clear that up and "they went and took the beeper away from
them." 

 Copeland had no idea how many trailers King sold after October 8, 1999, and did
not know if there were any records to that effect. Deason testified King was not given a
credit to his account for every tow dolly sold by Perkins Trailer after October 8, 1999,
because he no longer worked for them. According to Deason, King no longer worked for
Perkins Trailer when he failed to "come in and pay for the tow dollies." Deason testified
that King got credit for the tow dollies he personally sold over the phone after October 8,
1999. When asked who kept track of those sales, Deason said it was indicated on the
invoices, which are the only record of how many King sold over the phone. Defense
Exhibit 16 contains five invoices representing sales made by King, one in October 1999
and the other four in November 1999. On three of the invoices, an amount is noted for
which to credit King. Deason testified Copeland determined how much credit to give King
for a sale but he did not know the basis for that determination. Deason did not keep count
of what King sold over the phone except by way of the invoices. 

 Prior to King leaving September 1999, sometime in 1998 or 1999, probably the
summer of 1999, Copeland had lunch with King, Summerall, Charles Perkins, and Bruce
Deason. Copeland testified that King said if anybody ever screwed him in the tow dolly
business, he would burn them out, just like he did John Tart. Deason recalled that lunch
meeting and testified that King made threats, saying "he would burn out anybody that
screwed him. He had already done it once before to Master Tow." Deason further
testified that, "At the time everything was going good. He was just blowing and going. 
There was no problems at that time with [King]." Deason learned Master Tow burned
down from King and from later conversations with John Tart. 

KING'S DEBT


 Defense Exhibit 2 is a ledger entitled "Ben King Debt." It was prepared by Deason
for Copeland because he "was just curious about how much money that we had loaned Ben
King and his shortages; and I asked Bruce to give to me some kind of a total of what that
amount was." It contains Deason's personal notations concerning how much King owed. 
According to Copeland, Deason would be the best person to explain the figures. 

 The ledger was not created until November of 1999 when Deason got a computer. 
All of his entries were done in the invoice books. Deason did not keep separate books for
each driver or customer. According to Deason, the ledger stops in November 1999 and
was not updated because the computer's hard drive crashed in May 2000. Deason testified
the summary is not accurate and admitted there are no accurate records. Deason had no
idea how many mistakes might have been made but agreed he probably made mistakes and
some could have been in favor of Perkins Trailer. It would require looking at every single
invoice and adding them all up to determine the true state of King's affairs. Deason has
no other documents and no records were ever compiled from the invoices. 

 The ledger contains entries beginning April 18, 1998, until November 1, 1999, and
reflects a total debt of $43,251.21 owed by King. Below the typewritten portion is a
handwritten part adding the load taken by Jason, valued at $11,555 and the load taken by
King, valued at $11,889, producing a new total of $66,695.21. Deason could not identify
the handwriting but agreed it could be Copeland's. Deason then testified as follows: 

 Q. Was that written on there by someone from Perkins Trailers?

 A. Yes.

 . . . .

 Q. What does it say?

 A. It says "two more loads, Invoice No. 1151, Jason, 5700, Ben" and the dollar
amount.

 Q. Isn't that the two loads that Ben King is presently under indictment for?

 A. Yes, sir.

 Q. Didn't Perkins Trailer invoice those two loads over to his, quote, debt?

 A. No, sir, that was just giving us a calculation of how much money we were
down.

 Q. How much money he owed. Right?

 A. Yes.

 Q. Because before you figured that in, you said he owed $43,251.21. Then you
kick in these other amounts; and then somebody says he owes on his debt -
that's what it says - $66,695.21. Right?

 A. Yes, sir.


At the close of Deason's testimony, out of the jury's presence, the following transpired: 


 THE COURT: I have a question just to clarify something on my own. And
correct me if I'm wrong.

 What I understand happened is Ben King leaves theoretically with two
loads September and October the 8th. After that you continue to have
contact with him in the process of him selling trailers by making the
arrangements and then the company delivering the trailers or tow dollies.

 THE WITNESS [Deason]: Yes, sir.

 THE COURT: And what you would do is - when the two loads that he took
did not return, you moved that amount over to his debt, I'm going to call it;
and whatever he would sell by phone, you would apply over to that debt.

 THE WITNESS: Yes, sir.

 THE COURT: This went on for approximately a couple of months.

 THE WITNESS: Yes, sir, the first of December.

 THE COURT: At what point did you decide or the company decide that they
need to go file charges?

 THE WITNESS: I don't know because I was not the one that filed the
charges. I don't know - I was informed, "Do not talk to Ben King no
more."

 THE COURT: All right.

 [THE STATE]: Your Honor, may I state - and I know I'm not the lawyer
on this particular thing. I believe his testimony had been there was some
handwriting on that ledger which seems to indicate that those two amounts
from the two loads were added to the ledger. [Defense Counsel] asked him,
"Was that your handwriting?" He said it was not his. He said, "Could it
have been Mr. Copeland's?"

 And he said, "Yes, it could have been Mr. Copeland's." So it
seemed to me at this particular time he didn't have actual personal
knowledge whether the amounts from the two loads that were taken were
actually moved over to debt. Possibly we could clear that up with actually
Mr. Copeland.

 THE COURT: I understand. But you understand if it has been moved over
to a debt, we got problems.

 [THE STATE]: I also understand that.


Subsequently, Copeland testified it was his handwriting on Defense Exhibit 2. 

 The first entry of Defense Exhibit 2 is dated April 18, 1998, and reflects a total of
"($15,729)" for "Trailer Det." According to Deason, it was a "trailer debt" incurred
before they started manufacturing tow dollies when King took a load of utility trailers to
sell. Deason denied the trailers were "charged" even though the parentheses generally
denote "you're charging that against the person's account." Deason agreed that Perkins
Trailer did not care what King did with the trailers so long as he brought back the money
or took financial responsibility. Defense counsel asked, "And he took financial
responsibility by accepting the $15,729 debt that he owed to Perkins; is that true?" 
Deason replied, "Yes, sir." 

 When King was asked if he owed Perkins Trailer $15,729 as of April 18, 1998, he
agreed his "credit line was around 15,000 at that time." About $4,000 was from trailers
he bought and sold, the rest was money they had loaned him while he was setting up the
manufacturing plant. Copeland added half the transportation costs incurred by King in
picking up component parts, etcetera, for the plant to King's debt. 

 The third entry is dated June 29, 1998, and reads "short" for the amount of $900. 
Copeland did not know what it meant but guessed that King came back $900 short after
selling a load so it was added to his debt. Copeland would not call it a line of credit and
said King never had a line of credit. Copeland described it as, "This is just his shortfalls
and the things that developed through the months that made him owe Perkins Trailer
Company money." Copeland acknowledged that King was incurring debt and Perkins
agreed to it. Copeland said, "[I]f the rules say that's a line of credit, then it's a line of
credit." 

 An entry dated October 9, 1998, provides "tow dolly left" for Invoice 5658 and an
amount of $9,900 added to King's debt. Copeland could not explain the entry. An entry
dated May 26, 1999, provides for a loan of $6,000 cash to King. 

 Defense Exhibit 4 reflects that on April 18, 1998, Invoice 4851 was prepared. It
reads "Payment on Tow Dolly" and shows an amount of $2,326. It further states "Pd Ck
#15897" and "Charles 4-18-98." Copeland agreed it appeared that on April 18, King paid
Perkins Trailer by Check 15897 the amount of $2,326 for twenty tow dollies but said it
could be that a check was paid to King for that amount. Defense Exhibit 2 fails to reflect
that transaction. Copeland thought it meant Perkins Trailer wrote a check to King because
he did not think King had a checking account. 

 Defense Exhibit 15 is a different ledger reflecting King's transactions from January
through October 1999. Deason does not have a ledger that covers the whole period of time
King did business with Perkins Trailer. There are no other records, just Defense Exhibit
15 and the invoices. There are no records for the years prior to 1999. 

 Defense Exhibit 15 shows zero balance for King until June 1999. Entry "6/16/-
6/24" reflects a balance owing of $1,621.05. By July 23, 1999, the balance increased to
$6,512.05. Entry "8/20-9/7" shows another increase to $7,143.40. On September 25,
1999, the amount of King's load, $11,889 is added. On September 28, 1999, King made
a payment of $4,568.80. Defense Exhibit 2 does not reflect that payment. On October
8, 1999, the amount of Jason's load, $11,555 is added and the balance shown is
$26,018.60. No payments are shown after that date. Defense Exhibit 2 shows a balance
of $45,330.33 as of October 8, 1999. The September 25 and October 8 loads are then
added by Copeland for a new total of $66,695.21. 

PAYMENTS BY BEN KING


 Copeland testified "I have received no payments" for the two loads of tow dollies. 
Copeland testified that after King left with the two loads, he sold some dollies and the
commission King was owed went to pay his debt, which did not include the two loads of
tow dollies. During Copeland's testimony, the following exchange occurred: 

 Q. How much money has Ben King paid Perkins Trailer since that day?

 A. On that load of tow dollies?

 Q. No, sir -

 [By STATE] Your Honor, I'm going to object to that. If it didn't go toward
these tow dolly loads in question, I don't see how it would be relevant.

 THE COURT: Overruled.

 Q. (By [Defense Counsel]) How much money has Ben King paid Perkins
Trailers since that day?

 A. I have not seen a total. I don't know for sure.

 . . . .

 Q. Who makes the decision - when Ben King makes a payment to Perkins
Trailer, who makes the decision to what part of the account, if any, the
payment is recorded to? Who makes that decision?

 A. Bruce [Deason] would make that decision knowing that he would be applying
it to his debt.

 Q. Are you saying that Bruce reserved the right that when a payment came in
from Ben King, Bruce reserved the right to decide which specific part of the
credit to apply it to?

 A. No, I didn't say that.

 Q. What did you say?

 A. Bruce knew where to apply the credit, and it was to apply - anything that
Ben did was to be applied to his debt.

 . . . .

 A. He has not paid anything on those tow dollies that he sold.

 Q. He has paid money since that time, has he not?

 A. Yes, he has.

 Q. I want to know who has the authority to decide whether to apply that to tow
dollies or the general line of credit or anything else. Who's making that
decision?

 A. Both Bruce and I have that authority.

 Q. And you're telling us that you refused and have refused to give him any
credit towards the payment for those tow dollies from the money that he's
paid you since October 8th.

 A. I'm telling you that the money that he paid in went towards his debt, not to
the tow dollies that he hauled off and did not pay for.

 Q. Why not apply it to the tow dollies?

 A. Why should I? The debt came before -

 Q. - 

 THE COURT: Wow. Let him answer the question. Go ahead.

 Q. Why not apply it to the tow dollies?

 A. Because he had prior debt - the loan, the shortages. That's what needed to
be paid.

 . . . .

 Q. But who are you - and I just want to know your legal basis - for you to
decide that if he paid $50,000 in - let's just pick a figure - if he paid it in,
you're going to say, "I would never apply it to the payment of these tow
dollies. I would apply it to this other area over here"?

 Do you have an agreement - where is your legal authority for you to
be the one to decide where to apply that debt?

 A. Sir, I don't know if I have legal authority but I do know which moneys this
needed to be applied to and it was the moneys that he borrowed from me, the
shortages that he had out on the trips prior to the last two loads of tow
dollies that he stole.


 Bruce Deason testified that Copeland instructed him to apply King's payments to
his prior debt. Deason was asked, "Is it possible that Ben King was paying money that's
not recorded on that summary that we looked at here, Exhibit No. 2?" He answered,
"Yes, sir, that is not an accurate . . .[sic]" 

 Deason testified that $3,689.23 was placed towards King's account after October
8, 1999. However, on Defense Exhibit 2 there are only two entries of payments by King
after October 8, 1999, for a total of $2,079.12. From September 25, 1999, when King
left with his last load, until November 1999, when the record ends, a total of three
payments were made by King, one each month, totaling $2,978.02. 

 King went through the invoices to find any amounts applied to his debt arising from
loads delivered by Buddy (Dewey Rathburn's replacement) from September to November
1999. Defense Exhibit 16 reflects applications totaling $12,109.36 were made to King's
account in October and November. Neither Defense Exhibit 2 nor 15 reflect that amount
credited to King's account. There did not seem to be any application of any proceeds from
September, during which time Buddy should have delivered about three loads. 

 King testified he had an agreement with Copeland whereby he was to receive $50
for any tow dolly taken to any of Perkins Trailer's lots. King did not see where he was
ever given credit in the records per that agreement. King further testified that checks made
out to him after September 25 were cashed by forging his signature. 

 OTHER DRIVERS


Jason Summerall


 Jason Summerall testified when he met Ben King, King was partners with Kent
Keenan and they were selling tow dollies under the name Load Star. King approached
Jason about delivering tow dollies. King told Jason he owned the tow dollies on a line of
credit from Perkins Trailer. King had his own manufacturing facility, called T&B
Manufacturing. Terry McCleese was part owner in T&B. Bill Spivey was one of the
investors in T&B. 

 Jason testified that once he had delivered the dollies taken from Perkins Trailer on
October 8 to dealers in Ohio and Virginia, King had him take two loads of tow dollies that
were manufactured at T&B and put Perkins Trailer Load Star tags on them. The following
week, Jason and Varner went to Florida to deliver the T&B tow dollies. The money was
given back to King. 

 Jason's salary was always paid in cash. If Jason and King were "way off," King
would have dealers pay in cash, rather than have Perkins Trailer wire money. King
always settled up with Perkins Trailer when they returned and Jason never returned from
a trip short. 

Roy King


 Roy King took a total of three loads from Perkins Trailer. Defense Exhibit 7 is an
invoice for twenty tow dollies taken by Roy on June 4, 1998. It shows the amount owed
was paid in full. Defense Exhibit 6 is Invoice 4872 for nineteen tow dollies taken by Roy
on June 22, 1998. It also was paid in full. Defense Exhibit 5 is Invoice 4880 for twenty
tow dollies, two "Tire & wheels," and four "set straps." (1) No payment is shown. The
invoice was filled out by Bruce Deason. 

 In a sworn affidavit, Copeland said Roy took two loads - the first load he paid for,
the second one he did not. Copeland said he was mistaken, that Roy took three loads. 
He took one load to Houston and came back on the same day and took the third load. 
Deason testified that Roy took three loads. 

 The load not paid for was valued at $9,135. That amount was added to King's debt
per King's instructions. King told Copeland to file criminal charges and he felt sure his
dad would pay. In 1998, Copeland claimed those items were stolen and filed charges on
Roy. In Copeland's opinion it should therefore be deleted from the summary of King's
debt. 

 According to Copeland, Roy was not King's employee but an independent agent. 
However, Deason testified that he would not have loaded the tow dollies on the trailer for
Roy without King's authorization. To Deason's recollection, it was King's decision to sell
tow dollies to Roy. Deason believed, based on several conversations with King, that King
instructed Perkins Trailer to sell tow dollies to Roy because Deason was manufacturing
more tow dollies than King was able to move. 

 King testified he told Copeland he did not want to sell tow dollies to Roy. King also
told Copeland he would stand good for any tow dollies sold to Roy. 

 Patrick Varner


 Patrick Varner was a salesman for Perkins Trailer with the same job responsibilities
as King, but was an independent salesperson. Defense Exhibit 11 is an invoice dated
October 9, 1998, for a load of tow dollies taken by Patrick. The invoice indicates, in
Bruce Deason's handwriting, that Patrick came in $3,675 short and "King will pay." King
agreed to the shortage being charged to his account. King testified that he fired Patrick
when he came in short.

 King testified that Copeland subsequently asked him about selling dollies to Patrick. 
King said neither Patrick nor his brother could work east of San Antonio and he refused
to stand good for anything else Patrick took. Perkins Trailer continued to do business with
Patrick, and Patrick became responsible for his own and Rodney's loads. State's Exhibit
15 shows Patrick left with a load of tow dollies on November 28, 1998, for which he never
accounted. Deason asked King if he had talked to Patrick about when Patrick would return
but did not remember King's reply. Patrick's brother Rodney was to deliver a load that
also went unaccounted for. King encouraged Copeland to file criminal charges on Patrick
Varner, which he did. 

Dewey Rathburn


 Dewey Rathburn was initially brought in by King to set up the manufacturing
equipment. Dewey worked for Perkins Trailer and received his paycheck from them. 
Defense Exhibit 12 is an invoice of a load taken by Dewey Rathburn, dated July 28, 1999.
Dewey did not return with the tow dollies or the money. King told Copeland he would go
collect the money, that Dewey was on a drunken spree and might not have all the money.
King got back the truck and trailer and part of the money. A balance of $4,789.50
remained and King took responsibility for it. The invoice provides, "Balance to be paid
on next trip to Washington State." After Dewey came up short, King fired him. Defense
Exhibit 2 does not reflect the shortage but Deason testified King did not pay it. 

 King testified he agreed the next trip he sent to Washington would pay for
Rathburn's shortage. According to King, he went to Washington for ten weeks in
February 1999 setting up dealers and would clear around $5,000 on the next trip. Two to
three trips a year were being made to Washington. Since October 1999, King estimated
they had made two or three trips to his dealer in Washington, which would have more than
covered Rathburn's shortage. 

THE INVESTIGATION


 Steve Thrower, senior criminal investigator for the district attorney's office of
Jefferson County, was assigned to investigate alleged thefts at Perkins Trailer Company
in Hamshire, Texas. Charlie Perkins informed Thrower that about a year earlier he had
reported a theft to the sheriff's office involving a salesman, Patrick Varner. The case had
not been filed in the intake division of the Sheriff's Office. Jesse Copeland came in and
gave a sworn statement. 

 There were three subsequent cases. The subject of the first report was Roy King. 
The theft Thrower was investigating concerned Varner. Subsequently, Thrower began
investigating Ben King. Charges were filed against Varner in April 1999. Copeland
reported King had made off with a couple of loads of dollies as well. 

 During the initial stages of the investigation, Thrower did not attempt to contact
King but after King called six or so times, Thrower finally spoke with him on November
23, 1999. Thrower talked with King about his employment with Perkins Trailer but more
specifically about the two loads of dollies Copeland claimed King had stolen. King gave
Thrower his version of his dealings with Perkins Trailer. 

 King told Thrower he owned his own sales company, Load Star Sales Company. 
King said he left with a load of dollies on September 25, 1999, and Jason Summerall left
with a load on October 8, 1999. King received that load as well. King said he had an
exclusive contract with Perkins Trailer under which he was the only authorized seller of
tow dollies manufactured by Perkins Trailer. The contract prohibited Perkins Trailer from
allowing anyone else to sell its tow dollies. Thrower asked King to send him a copy of the
contract and King faxed the photograph depicting King and Copeland shaking hands. 

 King said he was not responsible for the loads taken by Roy King and Patrick
Varner. King said Perkins Trailer was in violation of the contract by allowing them to sell
his tow dollies. King said both Roy and Patrick should be prosecuted for taking those
loads because they were not authorized to have them. 

 Thrower told King that he could not take property just because he thought Perkins
Trailer owed him money. King told Thrower he had not sent any money and was not
going to pay Perkins Trailer any money until they shut down their tow dolly business. The
invoice King faxed Thrower clearly states "customer." King claimed he was sold the tow
dollies and asserted, "I have never been given any tow dollies that Perkins Trailer has not
invoiced me for and that I have not signed for on my revolving account." King claimed
Perkins Trailer failed to apply over $10,000 to his debt. 

 It was clear to Thrower they were in a very serious controversy concerning who
owed who how much money. King told Thrower he had an open line of credit with
Perkins Trailer. Copeland told Thrower that King did not have an account. Thrower
never looked at Perkins Trailer books to see whether King had an account. Thrower
admitted that if King had an account, he would not be guilty of theft. 

EXTRANEOUS OFFENSES


Quality Products, Inc.


 Larry Robinette testified as to King's business dealings with Quality Products, Inc.
Robinette owned and operated the business with his brother-in-law, Carl Gibson. 
Robinette's business had two parts: R&G Manufacturing handled the construction of the
tow dollies and trailers and Quality Products sold them. King became a salesperson for
Quality Products. Robinette described the arrangement as one of consignment. The
product was furnished to King, he sold them, delivered them, came back, and turned in
the money he had collected along with any unsold product. Quality Products then paid
King a percentage of what he sold. 

 Defense Exhibit 14 is the contract between R&G Manufacturing and King. In the
contract, King is named as "purchaser." The tow dollies were "to be sold" to King and
he would then sell them under the name "Tow Lite." Under the contract, R&G
Manufacturing agreed to sell its product exclusively to Tow Lite. King was obligated to
pay for the tow dollies, at $465 a piece, and accessories. According to Robinette, they
also had "verbal contracts" which differed from the written one.

 King began coming in short on the money and incurred a substantial amount of debt
with Quality Products. On November 19, 1994, King left with a load valued at
approximately $9,500. After that, King did not work for Quality Products again. King
gave Robinette a personal check for the amount of that load but it bounced. Charges were
filed by Quality Products alleging breach of trust. A plea bargain was entered whereby
King pleaded guilty to the felony offense of breach of trust in exchange for probation and
restitution for the bounced check. The rest of King's debt was not recovered. 

 King testified that after selling the first load he bought from R&G, his truck was
stolen. When King informed Larry that he did not have a truck and could not work, Larry
told King to write him a postdated check and go buy a truck with the money from that
load. The check was postdated for thirty days. King took another load, came back and
paid for it. The next week, King was told by someone at R&G that once King established
the dealers, "he [Larry] wasn't going to sell me no more tow dollies and he was going to
take my dealers." King did not buy any more tow dollies from them. Larry then cashed
the check for the first load, which King did not have the funds to cover. Charges were
then filed. King remembered his guilty plea as follows: 

 A. The judge sat on the stand and asked me did I feel like I owed any
money to Larry Robinette. I said, "Yes, sir, I owe him $9550 on the
postdated check I wrote him."

 He said, "Well, if you feel like you owe him that money, then why
don't you just say you owe him that money and plead guilty and pay him his
money." He said, "Do you think you could pay it in five years."

 I said, "Yes, sir, I could pay it in five years."

 And he said, "Well, do you just want to plead guilty to owing Larry
that money?"

 I said, "I ain't going to deny I owe him the money, and I will plead
guilty to it."


King testified Larry had received his money and King has not done any business with
Larry since. According to King, two weeks before trial Larry called him wanting King
to sell some more tow dollies. 

Master Tow


 John Tart testified regarding King's business dealings with Master Tow, a North
Carolina business that manufactured tow dollies, utility trailers, landscape trailers,
motorcycle trailers and car haulers. Tart owned and operated Master Tow and became
interested in King being a salesman for his tow dollies after seeing a flier for a
competitor's tow dolly that had King's name on it. Tart's initial meeting was with both
Ben King and Roy King. Ben King asserted he could sell all the tow dollies Tart
produced. Roy began selling tow dollies for Tart on consignment. Tart provided a truck,
trailer, and the product. Roy took out the product to sell and brought the money back. 
Roy was considered an employee. Roy's commission was the difference between what he
was to repay Tart for the product and the price for which he actually sold the product. 
Roy brought a tow dolly to Tart to look at and Master Tow incorporated some
improvements. 

 Roy was with Tart from near the end of 1994 until July 1995. Roy left with a load
then called and said he could sell two loads if Tart got another load ready. Roy said he
would be back in a week to bring the money. Tart met Roy at the shop and loaded him
up. That was the last Tart ever saw of Roy. The value of the two loads was about
$36,000. 

 Ben King joined Master Tow about a year after Roy left. King said he could make
back what Roy owed. The arrangement with King was that the serial numbers of all the
dollies would be written down, like an invoice, which King would sign as a consignment
sheet that he was to return. On the invoice was the amount King owed Tart for the product
and his commission was whatever he sold it for above that amount. King paid for the first
load in advance and signed for the next. On the third load, King came back short because
of a truck problem. King offered a variety of reasons for being short, such as truck
payments, truck trouble, or that he owed money. The shortage was shown as a loan. King
maintained that if Tart would continue to provide tow dollies, he would make up for it. 
Near the end of the relationship, Dewey Rathburn was driving the truck. Tart assumed
Dewey was driving for King. 

 King left Master Tow around February 1996 with a load of tow dollies valued at
$19,000 and never returned. Tart kept a ledger of how much money King owed him. 
King accumulated a lot of debt with Master Tow before leaving with the last load. Tart
had no more contact with King until charges were filed for eight counts of embezzlement.
There were eight separate invoices for dollies that were sold and King had cashed the
checks. A plea bargain was made and King pleaded guilty to eight counts of conversion. 
Tart received restitution, but for less than what he claimed King owed him. 

 King later called Tart and said he knew some dealers that would buy from Master
Tow and asked if he (King) called them, would Tart send him a commission. Tart agreed
and King made some individual sales to a couple of dealers. Tart mailed King the check. 

 King testified that he had been on a trip with two loads of tow dollies and when he
returned, Tart told King that he was not going to sell him any more dollies and wanted
King to pay what he owed. King admitted to owing Tart money, but disputed the amount. 
Tart claimed King owed him approximately $29,000. King testified he sold 982 of Tart's
dollies and owed him for 44, a value of about $19,000. According to King, a check sent
from a dealer was received and dropped the balance to $13,700. Tart then told King that
if he let Tart sell to his (King's) dealers for one year, and King did not sell to any of the
dealers he had established, Tart would forgive his debt. King testified he broke the
agreement and Tart filed charges. To resolve it, King agreed to pay what he owed Tart.
After pleading guilty, King was ordered to pay the same amount of money he originally
said he owed Tart, was not assessed any fines or court costs, and was placed on
"nonsupervised probation." 

ANALYSIS


 This case is a classic example of the old saying, "where there is smoke, there must
be fire." The record reflects that Perkins Trailer received payments from King after
September 25, 1999, and after October 8, 1999. The record fails to establish the amount
of those payments. Accordingly, the record does not demonstrate King failed to pay for
the tow dollies. Copeland's unilateral decision to apply King's payments to the prior debt
and not the tow dollies cannot transform King's actions into theft. 

 Further, in order to sustain the conviction, the record must establish that at the time
King left on September 25, 1999, and at the time Jason Summerall left on October 8,
1999, King had no intention to pay for those loads. King made two payments after
September 25, and one after October 8, 1999. This negates any intent, at the time the
loads were taken, not to pay for them. This is true notwithstanding King's later statements
that he would not pay - particularly in light of his subsequent agreement with Copeland.

 After Copeland threatened to file charges if he did not pay for the tow dollies, King
agreed to sell tow dollies for Perkins Trailer in order to pay off his debt. The actual
amount of King's debt is unknown due to the state of the records of Perkins Trailer. The
amount King "earned" after November 1999 is also unknown. Therefore the record does
not establish that King failed to pay for the tow dollies. To the contrary, the
uncontradicted testimony of Jason Summerall would indicate King did.

 Finally, the record is replete with evidence that King did in fact have an account
with Perkins Trailer. The fact that neither Copeland nor Deason would call it an account
is not dispositive. The evidence patently shows that for two years King ran a "tab" for
every item he took from Perkins Trailer. Added to this account were personal loans, truck
down payments, truck payments, truck repairs, and the obligations of other drivers that
King assumed. The consolidation of King's "debt" is manifest in Copeland's addition of
the two loads of tow dollies to the ledger he asked Deason to prepare, Defense Exhibit 2. 
Not only does that ledger include the amounts of the two loads taken, but so does the
ledger for 1999. Defense Exhibit 15 shows the loads were added to King's "balance" on
the day they were taken, as with every other load during 1999. Regardless of how
Copeland would now like to characterize his arrangement with King, the record attests to
something far different. King's actions regarding the loads taken on September 25 and
October 8, 1999, were "business as usual." The deterioration of his relationship with
Copeland after that time cannot convert his actions into theft by deception. The debt,
assuming that after December 1999 King still owed Perkins Trailer money, cannot be
collected through the criminal process. There is simply no evidence from which a rational
trier of fact could find beyond a reasonable doubt that at the time of the acquisition King
intended to deprive Copeland of the forty-five tow dollies.

CONCLUSION


 For all of the above reasons, point of error one is sustained. The evidence being
legally insufficient to sustain the conviction, the judgment of the trial court is reversed and
an acquittal ordered. Greene v. Massey, 437 U.S. 19, 98 S.Ct. 2151, 57 L.Ed.2d 15
(1978); Burks v. United States, 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978). We do
not address King's remaining points of error.

 REVERSED AND ACQUITTED.




 DON BURGESS

 Justice


Submitted on June 6, 2002 

Opinion Delivered November 27, 2002

Do not publish


Before Walker, C.J., Burgess, and Gaultney, JJ.






Dissenting Opinion



 In a legal sufficiency analysis, the evidence must be viewed in the light most
favorable to the jury verdict. Lacour v. State, 8 S.W.3d 670, 671 (Tex. Crim. App.
2000). The majority finds no evidence appellant intended to not pay for the two loads of
tow dollies; but the majority does not factor in evidence which, I believe, a rational trier
of fact could have considered in convicting appellant.

 Evidence of other crimes, wrongs, or acts are admissible to prove intent. See Tex.
R. Evid. 404(b); see Hegar v. State, 11 S.W.3d 290, 296-97 (Tex. App.--Houston [1st
Dist.] 1991, no pet.) (in theft case, evidence of other transactions admissible to show
intent); see also Tex. Pen. Code Ann. § 31.03(c)(1) (Vernon Supp. 2002). The jury
heard evidence appellant had done this before. John Tart, a manufacturer of tow dollies
and other trailers for a company called "Master-Tow" testified concerning similar
transactions between his company and appellant. Just as in the present case, appellant was
to take tow dollies on consignment, bring back the money from the sales, and receive a
commission. Just as in this case, appellant's father, Roy King, left with loads of dollies
and never returned. Just as in this case, appellant began to come up short on the money
for the loads, ended up leaving with a load of tow dollies valued at $19,000, and was
eventually charged with a theft-related offense (embezzlement). 

 Larry Robinette, former owner of Quality Products, Inc., another manufacturer of
tow dollies and trailers, testified to another uncannily similar scheme by appellant. 
Appellant was again the salesperson for the company, and would take tow dollies on
consignment and bring back payment. Here again a familiar pattern developed. Appellant
would return short of money on loads. Ultimately, he left with a load of dollies valued at
almost ten thousand dollars and never returned to work for them again. These prior acts
resulted in additional criminal charges against appellant.

 I also disagree with the majority's conclusion that there is no evidence King failed
to pay for the tow dollies. For example, an investigator testified that appellant admitted
he had not paid for the loads of dollies in this case. According to the investigator,
appellant stated to him, "Well, I haven't sent them any money; and I'm not going to pay
them any money until they shut down their tow dolly business." 

 Because I disagree with the majority's conclusion that the jury heard no evidence
of appellant's intent not to pay for the two loads of tow dollies, I respectfully dissent.


 _________________________________

 DAVID B. GAULTNEY

 Justice


Dissent Delivered

November 27, 2002

Do Not Publish 
1. The same invoice was also admitted into evidence as State's Exhibit 12.